## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KENYATTA WHITE,
        Petitioner

    v.

TIFFANIE CLARK,
        Respondent

No. 21 CV 3499

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

Following a bench trial in the Circuit Court of Cook County, Petitioner Kenyatta White was convicted of first-degree murder for the shooting of Aramein Brown and was sentenced to fifty-five years' imprisonment. The petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, arguing that he was denied his right to effective assistance of both trial and appellate counsel, and that his due process rights were violated during his trial. For the reasons below, the Court denies the petition and declines to issue a certificate of appealability.

## BACKGROUND[1]

### I.    THE SHOOTING AND THE PETITIONER'S TRIAL

Around 10:30 p.m. on January 6, 2003, Aramein Brown was shot and killed at a gas station located at the corner of 79th Street and Yates Avenue in Chicago,

---

[1] The background facts are drawn from the state court record, (R. 22; R. 38), and from the Illinois Appellate Court's and the Illinois Supreme Court's opinions on direct appeal and postconviction review. The Court presumes that the state court's factual determinations are correct as the petitioner neither contests them nor points to clear and convincing evidence to the contrary. *See Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018)).

Illinois. *People v. White*, 956 N.E.2d 379, 381 (Ill. 2011). An investigation into the murder led to the petitioner's arrest in East St. Louis, Illinois on February 20, 2003. *Id.* A few days later, the petitioner was transported back to Chicago, placed in a lineup, and positively identified as the shooter by two witnesses. *Id.* at 381–82, 387. The petitioner's attorney was present at the lineup but was not permitted in the room with the witnesses to observe their identifications. *Id.* at 381.

The case proceeded to a bench trial on January 24, 2006.[2] *Id.* at 383. Although multiple eyewitnesses identified the petitioner as the shooter in police interviews, a photo array, an in-person lineup, and grand jury testimony, the petitioner's trial was marred by questionable motives, shifting testimonies, and recantations. *People v. White*, 2020 IL App (1st) 182237-U, ¶ 5. "The evidence suggested [the petitioner] was a known criminal leader in the neighborhood where the shooting took place, the victim and his family were also involved in criminal activity, and many of the witnesses feared retaliation by [the petitioner] and/or the victim's families." *Id.* There was, however, a disinterested witness, namely Sherry Collier, who provided consistent, unequivocal testimony that the petitioner was the shooter. *Id.*

Collier testified that, at the time of the shooting, she had just moved to the neighborhood with her five-year-old grandson. *White*, 956 N.E.2d at 386. That night, Collier and her grandson were at the gas station using the payphone. *Id.* Collier observed a van at the gas pump and noticed a person coming toward her down 79th

---

[2] On the day of trial, the trial court denied the petitioner's co-counsel's motion for leave to file an appearance on behalf of the petitioner due to a conflict of interest. *People v. White*, 917 N.E.2d 1018, 1021 (Ill. App. Ct. 2009).

Street. *Id.* The man came within five feet of her and her grandson, and Collier said she got a "good look" at the man, testifying that he had a "distinct face." *Id.* Collier explained that the petitioner pulled out a gun, walked toward the pumps, and shot a man standing by the van before fleeing from the scene. *Id.* She spoke to police officers that night and described the shooter as having dreadlocks and wearing black pants, a black hoodie, a leather jacket, and a skullcap. *Id.* at 386–87. Collier identified the petitioner as the shooter in a photo-array, in a lineup, and in open court at trial. *Id.*

In addition to Collier, the State called two other eyewitnesses at the petitioner's trial, Martina Brewer and Shawn Davis. *Id.* at 383–86, 388. Brewer was Aramein's girlfriend and was present with him at the gas station on the night he was killed. *Id.* at 383. Brewer testified that the victim was outside talking to his cousin when she heard a loud sound like a firecracker. *Id.* She looked up and saw a man running away and the victim fall to the ground. *Id.* Brewer testified that she ran after the shooter but eventually returned to the gas station at which time she was approached by Ajani Brown, the victim's brother. *Id.* According to Brewer, she told Ajani that she did not know who shot his brother, and he instructed her to say that "Yatta" did it if anyone asked. *Id.* Brewer maintained at trial that she did know who the shooter was but acknowledged that she previously identified the petitioner as the offender in a photo-array and in her grand jury testimony. *Id.*

The State's third eyewitness, Shawn Davis, testified that he was living on Yates Avenue on the date of the shooting. *Id.* at 388. Davis was exiting his home that evening when he heard three gunshots coming from the direction of the gas station.

*Id.* He looked in the direction of the gunshots and saw a man running toward a burgundy car. *Id.* The man got into the passenger side, and the car sped away. *Id.* Davis testified that there is a streetlight in front of his house, and he saw the man's face illuminated by the light. *Id.* He identified the petitioner as the man he saw that night in a photo-array and in open court at trial. *Id.* at 388, 391.

The State also adduced testimony from multiple police detectives, investigators, and Assistant State's Attorneys regarding their investigation of the murder and the witnesses' out-of-court identifications. One of the Assistant State's Attorneys testified that he met with Brewer prior to her grand jury testimony, and she related to him that she knew the shooter by the name of "Yatta," identified the petitioner as the shooter by his photo and indicated that no one had threatened or coerced her to identify the petitioner as the shooter. *Id.* at 386. One of the investigators testified that he was present for a discussion with Brewer during which she related that she was afraid to testify against the petitioner because she heard that there was going to be a "hit" on her if she did. *Id.* at 389. During that conversation, Brewer was asked whether the petitioner shot the victim, to which she responded affirmatively, acknowledging that the petitioner had a distinctive face. *Id.* Brewer further related that she had heard the petitioner had intended to kill Ajani but mistook the victim for his brother. *Id.* One of the responding police officers testified that he spoke with Brewer, Collier, and Davis when he arrived on scene, and all three provided a similar description of the offender as wearing dark or black

clothing. *Id.* at 390. Finally, one of the detectives testified that Collier identified the petitioner immediately upon viewing the lineup. *Id.* at 391.

At the close of the State's case, the petitioner moved for a directed finding. *Id.* at 392. In arguing that motion, the petitioner's counsel addressed his decision not to challenge Brewer and Collier's photo-array and lineup identifications, explaining:

> . . . And the reason being, your Honor, is I don't know how the police department could create a fair lineup with Mr. White. I don't know how they could do it.
>
> When the court as the trier of facts looks over and looks at Mr. White, there's one thing that is obvious; and, that is, Mr. White's facial features. We can't get by that. We can't get around that.

*Id.*

The trial court denied the petitioner's motion. *Id.* at 393. In doing so, the trial court found Brewer's "grand jury testimony, her statements to the police immediately following [the shooting], [and] her identification to the defendant in a photo array to the police" to be more credible than her recantation as to the shooter's identity at trial. *Id.* The trial court also noted that Collier's testimony supported Brewer's testimony and that Davis corroborated the petitioner's flight from the scene. *Id.*

For his defense, the petitioner called witnesses who testified that they either saw the shooter and it was not the petitioner or equivocated in their prior identifications. Samantha Davis, Shawn's sister who lived with him on Yates Avenue, testified that the petitioner was not the man that she saw running away on the night of the shooting, but acknowledged that she had initially told the police that she would not be able to identify the shooter. *Id.* at 393–94. Brian Williams, who was driving

5

and stopped at a nearby intersection at the time of the shooting, testified that he was not initially involved in the investigation, but three years later, and one week before trial, a private defense investigator met with him and showed him a photo of the petitioner (who he did not recognize as the shooter). *Id.* at 404–06. Ryan Slaughter, who was in the car with Williams, identified the petitioner as the shooter by photo, in a lineup, and in his grand jury testimony, but equivocated on his identification at trial, testifying that he told the police officers that the person he identified resembled the shooter, but he never said for certain it was him. *Id.* at 382, 398–99.

The petitioner also called two alibi witnesses, Annie Mae Handy and Tonya Evans, who testified that the petitioner was at their house on the night of the shooting and that he did not leave until around 11:00 p.m. *Id.* at 395–96. Although Handy testified that the petitioner would occasionally show up at her residence, neither she nor Evans could provide any dates that the petitioner had been to their house prior to the night of the shooting. *Id.* Both witnesses acknowledged that the petitioner called them the day after the shooting to secure his alibi, telling them that he had been accused of killing somebody. *Id.*

Another witness, Akim Akbar, testified that he and David Jennings, the victim's cousin, went to the gas station on the night of the shooting to sell marijuana to the victim. *Id.* at 397. Akbar testified that he was returning to his van from inside the gas station when he saw a man start shooting at the victim. *Id.* Akbar knew the petitioner, but said the shooter was not him. *Id.* He acknowledged that he was aware the police were looking for the petitioner, but never told anyone that the shooter was

6

someone else. *Id.* Akbar testified that he knew that there was animosity between the petitioner and the victim's family at the time of the shooting. *Id.*

The petitioner also testified at trial. He attributed his "distinctive look" to a condition called acromegaly, a growth hormone defect that causes protruding growth.[3] *Id.* at 400. The petitioner acknowledged that he knew the victim's family and confirmed that they had a "falling out" in late 2002 or early 2003 when the petitioner discovered that Ajani Brown was "wearing a wire for the government." *Id.* The petitioner further related that his nephew, Antwon White, was killed in November 2002, and Aramein's other brother, Sundiata Brown, had been arrested in connection with the killing. *Id.* Despite this acrimonious relationship with the Brown family, the petitioner maintained that he did not have anything to do with the killing of Aramein. *Id.* Instead, his testimony regarding his whereabouts that evening tracked that of Handy's and Evans' testimony. *Id.* at 400–01. He acknowledged that he knew the police were looking for him in connection with the shooting, but that he did not go to the police with his alibi. *Id.* at 401. Instead, he went to East St. Louis with Handy's other daughter, Anastasia Smith. *Id.*

Following presentation of the State's rebuttal case, during which it called investigators, police officers, and Assistant State's Attorneys to testify regarding their interactions with the defense's witnesses (Handy, Evans, Smith, Slaughter, and Samantha Davis), the parties made their closing arguments, and the trial court

---

[3] *See* Acromegaly, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/17743-acromegaly.

rendered its decision. *Id.* at 403–04, 406. Based on the credibility of the witnesses and the reasonableness of their testimony, the trial court concluded that the petitioner was proven guilty of first-degree murder. *Id.* at 407.

On the hearing date for posttrial motions and sentencing, the petitioner, through trial counsel, informed the trial court that he wished to have a different attorney represent him for posttrial proceedings and requested a continuance to permit the new attorney to appear and "get[ ] up to speed." *White*, 2020 IL App (1st) 182237-U, ¶ 10. The trial court denied the petitioner's request and the matter proceeded on the petitioner's trial attorney's posttrial motion. *Id.* The trial court denied the motion, *id.*, and sentenced the petitioner to fifty-five years' imprisonment. *People v. White*, 03 CR 710901, 2006 WL 6394442 (Ill. Cir. Ct. Mar. 9, 2006).

## II. DIRECT APPEAL

The petitioner appealed his conviction, arguing that he was denied his Sixth Amendment right to counsel on two occasions: (1) when the police barred his trial attorney from observing witnesses identify the defendant in a lineup, and (2) when the trial court denied co-counsel's motion for leave to file an appearance at the start of trial. (R. 38-1 at 26–55.) Although the petitioner procedurally defaulted these claims by failing to raise them in a posttrial motion, the Illinois Appellate Court considered them under the closely-balanced-evidence prong of Illinois' plain-error doctrine.[4] *People v. White*, 917 N.E.2d 1018, 1026–27 (Ill. App. Ct. 2009). The state

---

[4] Illinois' plain-error doctrine allows a reviewing court to consider an unpreserved claim when there is a clear or obvious error and (1) the evidence is closely balanced or (2) the error is so serious that it affects the fairness of the defendant's trial. *See People v. Piatkowski*, 870 N.E.2d 403, 410–11 (Ill. 2007).

appellate court concluded there was no Sixth Amendment violation as to either issue and affirmed the petitioner's conviction. *Id.* at 1036, 1040, 1043–44.

The petitioner, through counsel, challenged the state appellate court's ruling in a petition for leave to appeal ("PLA") to the Illinois Supreme Court. (R. 38-4.) He argued that the appellate court erred in holding no Sixth Amendment violation with respect to the lineup procedures. (*Id.* at 9–17.) The Illinois Supreme Court granted leave to appeal and affirmed the appellate court's judgment insofar as it upheld the petitioner's conviction. *White*, 956 N.E.2d at 381. The state's highest court held, however, that—contrary to the petitioner's argument and the appellate court's finding—the evidence was not closely balanced and, thus, the Sixth Amendment claim did not fall within the purview of Illinois' plain-error doctrine. *Id.* The Illinois Supreme Court rejected the parts of the appellate court's opinion "that discussed, and rendered holdings on, the issues of attachment of the right to counsel and the lineup procedure employed," finding the appellate court's consideration of these issues "unnecessary[y]." *Id.* at 417.

### III. POSTCONVICTION PROCEEDINGS

Following completion of his direct appeal, the petitioner, through counsel, filed a postconviction petition that raised various claims, including:

1. Actual innocence

2. Ineffective assistance of trial counsel for failing to:
    (a) call Sundiata Brown as a witness
    (b) impeach Collier with a prior statement
    (c) retain an independent ballistics expert

3.    Ineffective assistance of appellate counsel for failing to argue:
   (a)   the denial of the petitioner's motion for substitution of counsel violated the Sixth Amendment
   (b)   Illinois' plan-error doctrine permitted review of the Sixth Amendment lineup procedure claim
   (c)   trial counsel was ineffective for failing to move to suppress the lineup on grounds that: (i) trial counsel was barred from observing the witnesses' identifications; (ii) there was a delay in presenting the petition for his initial court appearance; and (iii) the lineup was unduly suggestive
   (d)   trial counsel was ineffective for failing to challenge the photo-array as suggestive

4.    Cumulative error

(R. 22-3 at 223–45.)

In support of his actual innocence argument, the petitioner advanced a theory that Daryl Boston, a hitman from the Gangster Disciples street gang, shot Aramein in retaliation for a home invasion that was allegedly perpetrated by Aramein's brother, Ajani. (*Id.* at 223–24.) The petitioner submitted various affidavits in support of this theory, including affidavits authored by: Monte Dawson, an investigative consultant retained by the petitioner for his post-conviction proceedings, (R. 22-3 at 249–53 ("Dawson Aff.")); Marshaun Laws, a Gangster Disciples member who allegedly assisted Boston with the hit on Aramein, (R. 22-3 at 280 ("Laws Aff.")); David Jennings, Aramein's cousin who was present at the gas station on the night of the shooting, (R. 22-3 at 264–66 ("Jennings Aff.")); and Blessth Beacham, a friend of the petitioner. (R. 22-3 at 268–69 ("Beacham Aff.").)

Dawson's affidavit stated that he interviewed Laws who told him that Boston shot Aramein. (Dawson Aff. ¶¶ 2, 14.) Laws' affidavit stated he was near the gas station at the time of the shooting, that he saw the person who shot Aramein, and

that the petitioner was not the man he saw. (Laws Aff. ¶¶ 1–6.) Jennings' affidavit related that "[t]he guy who shot [his] cousin was smaller, much younger guy than [the petitioner]." (Jennings Aff. ¶ 7.) And Beacham said that she visited Ajani in Cook County Jail after hearing rumors that he had framed the petitioner for Aramein's murder and that Ajani admitted to the framing. (Beacham Aff. ¶¶ 3–5.)

The petitioner also submitted a DEA Report summarizing an interview with Aramein's brother, Sundiata Brown, to corroborate Brewer's testimony that she was approached by Ajani following the shooting. (R. 22-3 at 225.) In the report, Sundiata related that he and Ajani went to the scene after Ajani received a phone call from Jennings that Aramein had been shot. (*Id.* at 260.)

The post-conviction trial court denied the petitioner's post-conviction petition at the first stage of proceedings as "patently frivolous and without merit and res judicata from Appellate Court." (R. 38-9 at 63–64.) The petitioner appealed, (*id.* at 1–52), and the Illinois Appellate Court reversed, holding that the petition was sufficient to advance to the second stage of postconviction proceedings. *People v. White*, 24 N.E.3d 158, 167–68 (Ill. App. Ct. 2014).

On remand, the petitioner, through counsel, filed a supplemental petition that added a due process claim, alleging that the State failed to disclose that Shawn Davis had recanted his testimony and knowingly used the witness' perjured testimony at trial. (R. 22-3 at 520–26.) To support these supplemental claims, the petitioner attached Shawn Davis' affidavit to his postconviction petition. (*Id.* at 529–30 ("Davis Aff.").) In his affidavit, Davis stated that, he "only got a quick glance" at the man

11

running away from the scene of the shooting, describing the individual as "wearing a dark hoodie with the hood over his head" and with "dreadlocks sticking out of the hood." (*Id.* ¶ 4.) He identified the petitioner in a photo-array as the man he saw that night, (*id.* ¶ 5), but began to question his identification prior to the petitioner's trial. (*Id.* ¶ 6.) Davis' affidavit claimed that, on the day he was scheduled to testify, he told the prosecutor that he had "picked the wrong guy." (*Id.* ¶ 8.) According to Davis, the prosecutor responded, "it was him," and told Davis that if he didn't say it was the petitioner, he would be "charged with contempt and locked up." (*Id.*)

The State moved to dismiss the petition and, following a hearing on the motion, the trial court dismissed the petitioner's petition for postconviction relief. (*Id.* at 546–66, 626–58.) The petitioner appealed the court's dismissal, arguing:

1. Actual innocence

2. Ineffective assistance of trial counsel for failing to:
   (a) call Sundiata Brown as a witness
   (b) impeach Collier with a prior statement

3. Ineffective assistance of direct appeal counsel for failing to argue:
   (a) a Sixth Amendment violation based on the denial of the petitioner's motion for substitution of counsel
   (b) trial counsel was ineffective for failing to move to suppress the lineup as unduly suggestive
   (c) trial counsel was ineffective for failing to challenge the photo-array as suggestive

4. The State violated the petitioner's right to due process by:
   (a) failing to disclose Shawn Davis' recantation to the defense
   (b) knowingly using Shawn Davis' perjured testimony at trial

(R. 38-12 at 29–62.)

12

The Illinois Appellate Court affirmed the judgment of the trial court dismissing the petitioner's postconviction petition. *White*, 2020 IL App (1st) 182237-U, ¶ 67. The petitioner then presented his claims, through counsel, in a PLA to the Illinois Supreme Court. His PLA, however, did not raise his ineffective assistance of trial counsel claim for failing to call Sundiata Brown, nor did it raise his ineffective assistance of appellate counsel claims for failing to challenge trial counsel's ineffectiveness on grounds that he failed to contest the lineup and the photo array as suggestive. (R. 38-15 at 15–25.) The Illinois Supreme Court denied his PLA. *People v. White*, No. 12-6608, 167 N.E.3d 633 (Table) (Ill. Mar. 24, 2021).

## IV.  HABEAS PROCEEDINGS

The petitioner timely filed a habeas corpus petition on June 30, 2021, (R. 1), which he later amended. (R. 29.) The amended petition raises four claims:

> 1.  A Sixth Amendment violation because the petitioner's attorney was not permitted to view the witnesses' identifications during the lineup
>
> 2.  Ineffective assistance of trial counsel for the failure to:
>     (a)  call Sundiata Brown as a defense witness at trial
>     (b)  impeach Collier with her prior statement to police
>
> 3.  Ineffective assistance of appellate counsel for the failure to argue:
>     (a)  the trial court's denial of the motion to substitute counsel violated the Sixth Amendment
>     (b)  ineffective assistance of trial counsel for failing to move to suppress the lineup as unduly suggestive
>     (c)  ineffective assistance of trial counsel for failing to challenge the photo-array as unduly suggestive
>
> 4.  A due process violation based on the State's:
>     (a)  failure to disclose Shawn Davis' recantation
>     (b)  use of Shawn Davis' perjured testimony at trial

(*Id.* at 22–58.)

13

The State argues that the petitioner is not entitled to habeas corpus relief on any of his claims because they are either procedurally defaulted or meritless. (*See, generally*, R. 37.) For the reasons discussed below, the Court agrees.

## LEGAL STANDARD

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), provides the statutory authority for federal courts to grant habeas corpus relief to individuals in state custody. *Pierce v. Vanihel*, 93 F.4th 1036, 1044 (7th Cir. 2024). Under the AEDPA, federal habeas corpus relief is not warranted unless "the state court's adjudication of the claim (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) was based on an unreasonable determination of the facts." *Id.* (citing 28 U.S.C. § 2254(d); *Schmidt v. Foster*, 911 F.3d 469, 476 (7th Cir. 2018) (en banc)). "A state court's determination is 'contrary to' clearly established law if it applies a rule that contradicts the law." *Reyes v. Nurse*, 38 F.4th 636, 647 (7th Cir. 2022) (citing *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011)). If the state court identifies the proper law, the inquiry then turns to whether its application of that rule is unreasonable, that is whether "there was no reasonable basis for the state court's decision." *Id.* (internal quotation marks and citations omitted).

This "difficult to meet" and "highly deferential standard" reflects the view that "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Minnick v. Winkleski*, 15 F.4th 460, 468 (7th Cir. 2021) (internal quotation marks and citations omitted). In applying this standard, the Court looks to the "last reasoned state court

14

decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Pierce*, 93 F.4th at 1044–45 (internal quotation marks and citations omitted).

## ANALYSIS

### I.  PROCEDURAL DEFAULT

The State argues that the Court cannot review several of the petitioner's claims on the merits because they are procedurally defaulted. (R. 37 at 23–25.) Procedural default can occur in several ways, but "two are paradigmatic." *Clemons v. Pfister*, 845 F.3d 816, 819 (7th Cir. 2017) (citing *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014)). First, procedural default can occur if "the state court rejects a federal claim based on a state procedural rule 'that is both independent of the federal question and adequate to support the judgment.'" *Id.* (quoting *Richardson*, 745 F.3d at 268). Second, a state prisoner can procedurally default a federal claim "if he fails to 'fairly present' it 'throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings.'" *Id.* (quoting *Richardson*, 745 F.3d at 268). A procedural default bars the Court from considering the merits of the claim "*unless* the petitioner demonstrates cause for the default and prejudice resulting therefrom," or, alternatively, "that a miscarriage of justice would result if his claim were not entertained on the merits." *Perruquet v. Briley*, 390 F.3d 505, 515 (7th Cir. 2004) (citations omitted) (emphasis in original).

### A.  Independent and Adequate State Grounds

In Claim 1, the petitioner argues that his Sixth Amendment right to counsel was violated when his attorney was not permitted to observe witnesses identifying

the petitioner in the lineup. The State argues that this claim is procedurally defaulted because the Illinois Supreme Court rejected it based on an independent and adequate state-law ground. (R. 37 at 23–24.)

Illinois law requires a defendant to include all claims of error in a posttrial motion for a new trial. *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005); *People v. Enoch*, 522 N.E.2d 1124, 1129–30 (Ill. 1988). Failure to comply with this requirement results in a waiver of the claim. *Miranda*, 394 F.3d at 992 (citing *Enoch*, 522 N.E.2d at 1129–30). "[W]hen a state court refuses to reach the merits of a petitioner's federal claims because they were not raised in accord with the state's procedural rules[,]" such as when the claim has been waived, "that decision rests on independent and adequate state ground." *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010); *see also Sturgeon v. Chandler*, 552 F.3d 604, 611 (7th Cir. 2009) ("A finding of waiver by the state postconviction court is enough to establish an adequate an independent state ground."). "[A]n Illinois court does not reach the merits of a [waived] claim simply by reviewing it for plain error." *Miranda*, 394 F.3d at 992.

There is no dispute that the Illinois Supreme Court, the last state court to consider this claim, found on direct appeal that the petitioner failed to raise the Sixth Amendment lineup issue in a posttrial motion and, thus, waived the claim for appellate review. *White*, 956 N.E.2d at 407–08. Indeed, the petitioner rightfully concedes this point. (R. 29 at 32.) The state court's discussion of the plain-error doctrine does not otherwise undermine the petitioner's waiver. *See Miranda*, 394 F.3d

at 992. Claim 1 is, thus, procedurally defaulted because the Illinois Supreme Court's decision rests on independent and adequate state grounds.

### B.    Fair Presentment

In Claim 2(a), the petitioner raises an ineffective assistance of counsel claim premised on trial counsel's failure to call Sundiata Brown as a witness. The petitioner further asserts, in Claims 3(b) and 3(c), ineffective assistance of appellate counsel claims based on the failure to challenge trial counsel's performance in not moving to suppress the lineup or the photo-array as unduly suggestive. The State argues these claims are procedurally defaulted under the fair presentment rule. (R. 37 at 24–25.)

Failure to exhaust a habeas claim in the state courts results in procedural default. *See Richardson*, 745 F.3d at 268. To satisfy the exhaustion requirement, a petitioner must "fairly present his federal claim to the state courts through one complete round of state court review." *Richardson*, 745 F.3d at 268 (citing *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013)); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999) (explaining the rule "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts"). In Illinois, a habeas petitioner must present the claim to both the Illinois Appellate Court and to the Illinois Supreme Court in a petition for discretionary review. *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018).

Although the petitioner raised Claims 2(a), 3(b), and 3(c) to the Illinois Appellate Court on postconviction appeal, (R. 38-12 at 29–62), he abandoned these claims in his postconviction PLA to the Illinois Supreme Court. (R. 38-15 at 15–25.) And while the petitioner raised other grounds of ineffective assistance of trial and

17

appellate counsel in his postconviction PLA, this does not avoid the procedural default of Claims 2(a), 3(b), and 3(c). Rather, the fair presentment rule "requires that the factual and legal substance of the claim remain essentially the same when the petitioner has exhausted his state court remedies and moved on to federal court." *Blackmon v. Williams*, 823 F.3d 1088, 1100 (7th Cir. 2016). Thus, "if a petitioner fails to assert in the state courts a particular factual basis for the claim of ineffective assistance, that particular factual basis may be considered defaulted." *Pole v. Randolph*, 570 F.3d 922, 935 (7th Cir. 2009). Such is the case here. The petitioner did not present the specific factual bases that predicated Claims 2(a), 3(b), and 3(c) to the Illinois Supreme Court. Accordingly, these claims are procedurally defaulted.

### C. Grounds to Excuse Default

The petitioner argues that, even if his claims are procedurally defaulted, the defaults should be excused. As stated above, to overcome his procedural defaults, the petitioner must demonstrate either "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that the failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### 1. The Cause and Prejudice Exception

First, the petitioner contends that his trial counsel's failure to preserve his Sixth Amendment lineup claim by failing to raise it in a posttrial motion constitutes cause to excuse the procedural default of Claim 1. (R. 29 at 52–53.)

"Cause" for purposes of excusing a procedural default "is an objective factor external to the defense that impeded the presentation of the claim to the state courts."

18

*Booker v. Baker*, 74 F.4th 889, 894 (7th Cir. 2023) (internal citations omitted). "A factor is external to the defense if it 'cannot be fairly attributed to' the prisoner." *Davila v. Davis*, 582 U.S. 521, 528 (2017) (quoting *Coleman*, 501 U.S. at 753). Attorney error may constitute an objective external factor that provides cause for excusing a default, but "only if that error amounted to a deprivation of the constitutional right to counsel." *Id.* (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)). Further, because "[t]he assertion of ineffective assistance as a cause to excuse procedural default in a § 2254 petition, is, itself, a constitutional claim[,]" the claim "must have been raised before the state court" or it, too, will be "procedurally defaulted." *Mata v. Baker*, 74 F.4th 480, 488 (7th Cir. 2023) (citing *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009)).

For the petitioner, this means that he was required to raise the claim that his trial counsel was ineffective for failing to preserve his Sixth Amendment claim in a posttrial motion at each level of state court review. *See Smith*, 565 F.3d at 352. The petitioner, however, did not do so. Thus, any alleged error by trial counsel for failing to preserve the Sixth Amendment lineup issue for appellate review cannot excuse the procedural default of Claim 1.

## 2. The Fundamental Miscarriage of Justice Exception

Next, the petitioner asserts that he is actually innocent and, thus, the procedural defaults of Claims 1, 2(a), 3(b), and 3(c) should be excused under the fundamental miscarriage of justice exception. (R. 29 at 32–42.)

"A habeas petitioner may use a claim of actual innocence to overcome a procedurally defaulted . . . habeas claim, as a way to prevent a miscarriage of justice." *Dixon v. Williams*, 93 F.4th 394, 403 (7th Cir. 2024), *reh'g denied,* No. 21-1375, 2024 WL 1510579 (7th Cir. Apr. 8, 2024). The bar to proving actual innocence, however, is an onerous one. *Id.* The "standard is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). A petitioner does not establish actual innocence "unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2012) (citing *Schlup*, 513 U.S. at 329).

To pass through the actual-innocence gateway, the petitioner must support his claim with "reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324; *see also Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim."). "New evidence" in this context does not mean "newly discovered evidence," rather it is "any evidence that was not presented at trial." *Dixon*, 93 F.4th at 403. "In evaluating the claim, the court is to conduct a comprehensive assessment that takes into account any reliable evidence probative of petitioner's innocence or guilt, even evidence that was

previously excluded." *Arnold v. Dittmann*, 901 F.3d 830, 837 (7th Cir. 2018). In other words, "the court is not bound by the rules of evidence that would govern at trial." *Id.*

Like he did in state court, the petitioner points to the affidavits of Jennings and Laws as proof of his innocence. (R. 29 at 33.) The petitioner contends that these affidavits demonstrate that he did not murder Aramein; rather, the killing was plotted and carried out by members of the Gangster Disciples in retaliation for a home invasion thought to be perpetrated by Ajani. (*Id.*) Neither of these affidavits, however, constitute the type of "powerful evidence" needed to surpass the high hurdle to show actual innocence.

The first concern with these affidavits is the unexplained length of time that it took for the affiants to come forward with their statements. In evaluating the reliability of the evidence of actual innocence, the Court considers "the timing of the submission and the likely credibility of [a petitioner's] affiants." *McQuiggin*, 569 U.S. at 399 (citing *Schlup*, 513 U.S. at 332). Jennings and Laws, individuals with criminal felony convictions themselves, signed their respective affidavits in 2012 (as did Dawson and Beacham)—more than nine years after the shooting and six years after the petitioner's guilty verdict. *See McDowell*, 737 F.3d at 484 ("Such 'eleventh hour' affidavits, containing facts not alleged at trial and accompanied by no reasonable explanation for delay are inherently suspect."); *Morales v. Johnson*, 659 F.3d 588, 606 (7th Cir. 2011) (explaining that "convicted felons have diminished credibility.") Further, although Dawson related in his affidavit that Jennings and Laws inculpated a man named Boston in the shooting, (Dawson Aff. ¶¶ 14, 22), neither Jennings nor

Laws averred as much in their respective affidavits. (*See generally*, Jennings Aff.; Laws Aff.)

Credibility and timing aside, the DEA Report, which the petitioner submitted in support of his actual innocence argument in his state post-conviction proceedings, corroborates the State's theory at trial—*i.e.,* that the petitioner had an acrimonious relationship with the victim's family. In the report, Sundiata Brown relates that he and his brothers, Ajani and Aramein, worked for a "mobile heroin distribution organization" led by the petitioner until they decided to start "operating on their own" in October 2002—a timeline that tracks the "falling out" that the petitioner testified to at trial. (R. 22-3 at 256, 258–59.) The report recounts various shootings following the Browns split from the petitioner, including the one that resulted in the killing of Aramein. (*Id.* at 260–61.)

Finally, the petitioner's new evidence does not sufficiently rebut the trial testimony of Collier—an eyewitness witness who, unlike Jennings and Laws, was new to the neighborhood and had no knowledge of, or relation to, the petitioner or the Browns. Indeed, Collier's identification and testimony, alone, is enough to reject the petitioner's actual-innocence argument. *See Hayes*, 403 F.3d at 938 ("[I]t is black letter law that testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar."). And though the petitioner attempts (unsuccessfully so) to undermine Collier's testimony with a prior statement to the police,[5] as the Illinois Supreme Court articulated:

---

[5] *See infra* p. 25–29.

> It would truly be an incredible sequence of coincidences that Martina Brewer would, immediately after the shooting, falsely identify the very person that Sherry Collier mistook for the killer; that Keith Slaughter would, without reservation, initially identify defendant as the shooter; and that Shawn Davis would identify the defendant as the man running from the gas station seconds after the shooting. Four unrelated individuals initially identified defendant as the person present, or running from, the gas station the night of the shooting. Obviously, those identifications were not mere coincidence.

*White*, 956 N.E.29 at 409–10.

In sum, the petitioner has not presented "the sort of evidence that could confidently demonstrate his innocence—no exonerating DNA evidence, record of incarceration at the time of the crime, video evidence of him in a faraway location, or other evidence that could establish innocence conclusively." *Dixon*, 93 F.4th at 405.

Accordingly, the petitioner cannot overcome his procedural defaults of Claims 1, 2(a), 3(b), and 3(c) under either the cause and prejudice exception, or the fundamental miscarriage of justice exception. These claims are therefore denied.

## II.   MERITS REVIEW

The Court now turns to its merits review of the petitioner's remaining claims: Claims 2(b), 3(a), 4(a), and 4(b). In conducting this review, the Court looks to the decision of the Illinois Appellate Court on postconviction appeal, as that is the last state court to address each of these claims in a reasoned decision on the merits. *See Pierce*, 93 F.4th at 1044–45.

### A.   Claim 2(b) – Ineffective Assistance of Trial Counsel

In Claim 2(b), the petitioner asserts an ineffective assistance of counsel claim based on his trial attorney's failure to impeach Collier with a prior statement that

23

she provided to police officers at the scene of the shooting. In this statement, Collier related that, while standing at the payphone, she observed the victim pumping gas and then drive his van to the rear of the gas station where the petitioner approached and started shooting. (R. 22-3 at 289.) The petitioner contends that trial counsel should have used this statement to impeach Collier's credibility because the rear of the gas station is not visible from the payphone. (R. 29 at 47–49.)

The relevant clearly established law governing the petitioner's ineffective assistance of counsel claim derives from *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the petitioner "must show both deficient performance by counsel and prejudice." *See Premo v. Moore*, 562 U.S. 115, 118 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 688). "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 104 (quoting *Strickland*, 466 U.S. at 694).

*Strickland* instructs that "[j]udicial scrutiny of counsel's performance must be highly deferential," and a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." 466 U.S. at 689. This deferential review in combination with "the constraints that the AEDPA imposes on" a federal habeas court's review of state court decisions means that the

24

Court's "application of *Strickland* here is 'doubly deferential.'" *Meyers v. Gomez*, 50 F.4th 628, 643 (7th Cir. 2022) (quoting *Knowles*, 556 U.S. at 123).

Applying *Strickland*, the Illinois Appellate Court rejected the petitioner's ineffective assistance claim, holding that trial counsel's lack of questioning of Collier about the location of the victim's van at the time of the shooting did not fall below an objective standard of reasonableness. *White*, 2020 IL AP (1st) 182237-U ¶ 12. The state court's correct identification of *Strickland* as the governing rule dooms any contrary-to argument under the AEDPA. *See Reyes*, 38 F.4th at 647. Equally, the state court's application of *Strickland* was not unreasonable.

There is no question that Collier's testimony was a key piece of the State's evidence. Unlike many of the other witnesses, Collier had no established connection to the neighborhood, the petitioner, or the victim. As the trial court put it in denying the petitioner's motion for a directed verdict, Collier "was credible. She was unimpeached. She had no motive to lie, to pick out a man she has never seen before in her life. She had only lived in that neighborhood for three days at the time of her—the shooting and when she made the identification to the police." (R. 22-1 at 423–24.)

The petitioner nevertheless argues impeaching Collier with her prior statement to the police was critical to his case, as it would have raised questions as to her observations and credibility. (R. 29 at 48–49.) But as the Illinois Appellate Court noted, trial counsel did challenge Collier's observations and did so "utilizing the very police report [the petitioner] now argues counsel failed to utilize more." *White*, 2020 IL App (1st) 182237-U, ¶ 43. Indeed, trial counsel used Collier's

statement in the police report to challenge the strength of her identification, questioning her regarding the "opportunity to view the perpetrator at the time of the crime, her degree of attention to the perpetrator, and the accuracy of her prior description of the perpetrator." *Id.* This strategy cannot be said to fall outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The petitioner's distinctive facial characteristics was a focal point of the defense that even the petitioner highlighted in his own testimony. (R. 22-1 at 902 ("Well, there are no two people that I know of that look like me, so when you talk about mistaken identity, I know that that's almost impossible."). Thus, when Collier testified that the shooter had a "distinct," "unusual," "long," "ugly" face, (*id.* at 149, 210), it was sound trial strategy to reference the police report and to question her on why she did not say as much to the responding officers at the scene.

By contrast, impeaching Collier on the location of the victim's van at the time of the shooting would do little to challenge the strength of the State's evidence, particularly because Brewer and Akbar, who were also present at the gas station, testified that the shooting occurred while Aramein was parked at the gas pumps. (*Id.* at 81–88; 752–56.) As the Illinois Appellate Court put it, "[t]rial counsel could reasonably choose to forego a point that would have gained him nothing and possibly cost [the petitioner]" by bolstering, rather than undermining, Collier's credibility. *White*, 2020 IL App (1st) 182237-U, ¶ 43. On these facts, the Court cannot conclude that the state appellate court's rejection of the petitioner's ineffective assistance claim

26

under *Strickland*'s performance prong was unreasonable.[6] *See, e.g., Meyers*, 50 F.4th at 643 (explaining that habeas relief is available "[o]nly if no reasonable argument can be made that" counsel's decision "was a legitimate strategic decision under *Strickland*."). Claim 2(b) is thus without merit and denied.

## B.    Claim 3(a) – Ineffective Assistance of Appellate Counsel

For Claim 3(a), the petitioner argues his appellate counsel provided ineffective assistance where he did not argue on direct appeal that the trial court violated the petitioner's Sixth Amendment rights when it denied his motion to substitute counsel. The petitioner contends that this claim would have been meritorious on direct appeal, as the trial court's denial of his request for a short continuance to allow his new attorney to appear for posttrial proceedings violated his constitutional right to counsel of his choosing. (R. 29 at 50–53.)

The *Strickland* standard also governs ineffective assistance of appellate counsel claims. *McNary v. Lemke*, 708 F.3d 905, 920 (7th Cir. 2013) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). As with claims based on the assistance of trial counsel, the petitioner must establish both deficient performance and resulting prejudice to prevail. *Id.* (citing *Strickland*, 466 U.S. at 687). With respect to *Strickland*'s performance prong, "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to

---

[6] As *Strickland* instructs, "there is no reason for a court deciding an ineffective assistance claim . . . to address both [the performance and the prejudice] components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697. It is therefore of no consequence that the Illinois Appellate Court did not reach *Strickland*'s prejudice prong in rejecting the petitioner's claim.

maximize the likelihood of success on appeal." *Id.* (internal quotation marks and citations omitted). "That said, it is 'possible,' albeit 'difficult,' to show that 'counsel's failure to raise a particular claim' amounted to ineffective assistance." *Id.* (quoting *Robbins*, 528 U.S. at 288). At bottom, the Court cannot "second-guess 'informed strategic choices.'" *Id.* (quoting *Strickland*, 466 U.S. at 691).

Correctly noting that *Strickland* governed the petitioner's ineffective assistance of appellate counsel claim, the Illinois Appellate Court rejected the claim, finding the underlying issue—*i.e.*, the denial of the motion to substitute counsel— lacked merit and, thus, counsel was not ineffective for not arguing it on appeal. *White*, 2020 IL App (1st) 182237-U, ¶ 51. In rejecting this claim, the state appellate court concluded that the trial court did not abuse its discretion in denying the petitioner's motion for substitution of counsel. *Id.* at ¶¶ 45–51. This conclusion was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

The Sixth Amendment right to counsel for criminal defendants includes the right to choice of counsel, but this right is not absolute. *Wheat v. United States*, 486 U.S. 153, 159 (1988). "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* Thus, while "a court may not 'arbitrarily or unreasonably deny a defendant the right to retain chosen counsel,' it is well-established that a trial judge 'retains wide latitude to balance the right to choice of counsel against the needs of

fairness to the litigants and against the demands of its calendar.'" *United States v. Balsinger*, 910 F.3d 942, 949–50 (7th Cir. 2018) (quoting *United States v. Sellers*, 645 F.3d 830, 834 (7th Cir. 2011)); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006) ("We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness.").

"This means . . . that trial courts have broad discretion to grant or deny a request for a continuance to substitute new counsel." *Sellers*, 645 F.3d at 834 (citing *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008)). In making this determination, Illinois state courts, like the federal courts, consider various factors, including "whether the request is a guise to temporarily thwart the administration of justice; lack of evidence that new counsel is ready, willing, and able to proceed with the case; failure of the defendant to articulate an acceptable reason for desiring new counsel; and representation by counsel for a lengthy period of time before the substitution request." *People v. Abernathy*, 926 N.E.2d 435, 445 (Ill. App. Ct. 2010); *cf. United States v. Harris*, 394 F.3d 543, 552 (7th Cir. 2005) (outlining factors to consider when deciding whether denial of a motion for substitute counsel is an abuse of discretion).

As the Illinois Appellate Court noted, the petitioner orally requested a continuance to substitute new counsel on the date his case was set for hearing on posttrial motions and sentencing. *White*, 2020 IL App (1st) 182237-U, ¶ 46. At that time, the petitioner's attorney, who had represented the petitioner for over three years—from the initial lineup procedures through trial—had fully prepared a posttrial motion and was ready to represent the petitioner at the hearing. *Id.* The

petitioner's proposed substitute attorney, on the other hand, was "apparently in the building for another trial" on this date, but "failed to appear (even briefly that day or sooner) to request the continuance." *Id.* What is more, the petitioner gave no reason for desiring new counsel, nor did he raise any deficiencies with his trial counsel's performance regarding posttrial matters.[7] *Id.* ¶ 51. The Illinois Appellate Court thus found no error in the denial of the petitioner's motion for substitution and, consequently, no merit to his ineffective assistance claim *Id.*

Other than arguing that the state court should have reached the opposite conclusion, the petitioner does not demonstrate how the state appellate court's consideration of the above factors was unreasonable, much less objectively so. *See Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quoting *Harrington*, 562 U.S. at 103) (To meet AEDPA's standard, "[t]he prisoner must show that the state court's decision is so obviously wrong that its error 'lies beyond any possibility for fairminded disagreement.'"). And because the Illinois Appellate Court determined that there was no error in denying the petitioner's motion for substitution, it was reasonable for the state court to conclude that the petitioner's ineffective assistance of appellate counsel claim failed. *See Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument . . . on appeal . . . does not constitute ineffective assistance of counsel."). Accordingly, Claim 3(a) is without merit and denied.

---

[7] In his habeas petition, the petitioner contends the denial of his motion for substitution "foreclosed" him "from asserting any challenge to [trial] counsel's conduct during trial," an issue he says is concerning given that his posttrial motion failed to raise a Sixth Amendment claim regarding the lineup procedures. (R. 29 at 52–53.) But the petitioner's proposed substitute counsel for posttrial proceedings represented him on direct appeal and, thus, could have raised the very ineffective assistance claim that he argues was foreclosed.

### C.    Claims 4(a) and 4(b): Due Process Violations

Finally, in Claims 4(a) and 4(b), the petitioner raises two due process violations concerning the State's handling of eyewitness Shawn Davis. The petitioner contends that the State violated his right to due process when it (a) failed to disclose that Davis had recanted his identification of the petitioner in the photo-array and (b) knowingly used Davis' perjured testimony that the petitioner was the man he saw running from the scene at trial. (R. 29 at 53–57.)

### 1.    Claim 4(a): *Brady* Claim

The first of the petitioner's due process claims—that the State failed to disclose favorable evidence to the defense—is governed by *Brady v. Maryland*, 373 U.S. 83 (1963). To establish a *Brady* violation, a defendant must point to evidence that was (1) favorable to the defense, (2) suppressed by the government, and (3) "material to an issue at trial." *United States v. Shields*, 789 F.3d 733, 746 (7th Cir. 2015).

The Illinois Appellate Court rejected the petitioner's *Brady* claim on postconviction appeal, holding that the petitioner failed to show that any failure by the State to disclose Davis' alleged recantation was material. *White*, 2020 IL App (1st) 182237-U, ¶ 60. This decision was not contrary to clearly established Supreme Court precedent, as the state appellate court correctly identified *Brady* as the governing rule. *Id.* ¶ 52. Likewise, the state court's application of *Brady* was not unreasonable.

Evidence is material for *Brady* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Socha v. Richardson*, 874 F.3d 983, 989 (7th

Cir. 2017) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "Such a probability exists where the suppressed evidence . . . undermines confidence in the outcome reached." *Boss v. Pierce*, 263 F.3d 734, 744 (7th Cir. 2001) (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). In reviewing materiality under *Brady*, a court must assess the cumulative effect of the suppressed evidence in the context of the entire record. *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019).

The Illinois Appellate Court reasonably concluded that Davis' recantation was not material, in that the prosecution's failure to disclose it did not undermine the court's confidence in the outcome. As the state appellate court noted, Davis' testimony did not stand alone. Rather, three other witnesses—Brewer, Collier, and Slaughter— "actually witnessed the shooting" and subsequently identified the petitioner as the shooter in a photo-array, in a lineup, or at trial. *White*, 2020 IL App (1st) 182237-U, ¶ 58. Davis, by contrast, did not witness the shooting; he saw only the perpetrator's flight from the scene. Indeed, at trial, the state court credited Davis' testimony for corroborating "the path that the [petitioner] took following the shooting." (R. 22-1 at 424.) As the Illinois Appellate Court put it, "[a]t best . . ., the trier of fact would have been presented with Davis's identifications of defendant close to the time of observation and his recantation years later based, not on something seemingly less than certainty that he identified the wrong man . . ." *White*, F2020 IL App (1st) 182237-U, ¶ 58. Although shifting testimony was prevalent throughout the petitioner's trial, the exculpatory effect of any contradictory testimony elicited was ultimately outweighed by the strength of the State's evidence, including the positive,

unwavering identification of Collier who stood within a few feet of petitioner before he approached the victim and began shooting. *See Hayes*, 403 F.3d at 938 ("testimony of a single eyewitness suffices for conviction").

All considered, the state appellate court reasonably concluded the undisclosed evidence concerning Davis was immaterial. Claim 4(a) is without merit and denied.

### 2.      Claim 4(b): *Napue* Claim

For the petitioner's second due process claim, the Court looks to the Supreme Court's decision in *Napue v. Illinois*, 360 U.S. 264 (1959). *Napue* holds that a State's knowing use of perjured testimony to secure a defendant's conviction violates his right to due process under the Fourteenth Amendment. *Id.* at 269. Like *Brady*, *Napue* claims also contain a materiality prong. *See United States v. Cosby*, 924 F.3d 329, 336 (7th Cir. 2019). To prevail on a *Napue* claim, the petitioner must show (1) the prosecution's case included perjured testimony, (2) the prosecution knew, or should have known, of the perjury, and (3) there is a likelihood that the false testimony affected the judgment of the jury. *See Meyers*, 50 F.4th at 647; *Cosby*, 924 F.3d at 336.

The Illinois Appellate Court's rejection of the petitioner's perjured testimony claim was neither contrary to, nor an unreasonable application of, *Napue*. Although exclusively citing to state law cases, the state appellate court correctly articulated the constitutional standard for evaluating such a claim. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (explaining that AEDPA "does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (emphasis in original). Like the *Brady* claim, the

Illinois Appellate Court rejected the petitioner's perjury claim on *Napue*'s materiality prong. As discussed above, this conclusion was not unreasonable. Davis' testimony, even if perjured, corroborated only the petitioner's flight from the scene. Meanwhile, the testimony of three other eyewitnesses placed the petitioner at the scene with a gun in his hand. Accordingly, Claim 4(b) is without merit and denied.

For the foregoing reasons, this Court cannot grant federal habeas relief on any of the petitioner's claims because they are either procedurally defaulted or meritless. The petitioner's habeas corpus petition is therefore denied.

### III. CERTIFICATE OF APPEALABILITY AND NOTICE OF APPEAL RIGHTS

The Court declines to issue a certificate of appealability. A certificate of appealability shall issue only if the petitioner can make a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing 28 U.S.C. § 2253(c)(2)). To make a substantial showing, the petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). For the reasons stated above, the Court finds that there is no substantial constitutional question for appeal because reasonable jurists would not find this Court's assessment of the petitioner's constitutional claims or procedural rulings debatable or wrong. *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) (citing *Slack*, 529 U.S. at 484–85).

34

The petitioner is advised that this is a final decision ending his case in this Court. If the petitioner wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(1). The petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if the petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. Fed. R. App. P. 4(a)(4)(A)(vi).

## CONCLUSION

Petitioner Kenyatta White's habeas corpus petition [1, 29] is denied. Any other pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) terminate Respondent Tiffanie Clark and replace her with Chance Jones, Day-to-Day Warden, Illinois River Correctional Center; (2) alter the case caption to *White v. Jones*; and (3) enter judgment in favor of the respondent. Civil case terminated.

Date: May 17, 2024

_____
JEREMY C. DANIEL
United States District Judge